Robert S. Kitchenoff
**WEINSTEIN KITCHENOFF & ASHER LLC**
100 South Broad Street, Suite 705
Philadelphia, PA  19110-1061
kitchenoff@wka-law.com
Tel: (215) 545-7200
Email: kitchenoff@wka-law.com

Scott C. Gayle
**TUGGLE DUGGINS P.A**.
P.O. Box 2888
Greensboro, NC  27402-2888
Tel: (336) 271-5232
Email: sgayle@tuggleduggins.com

*Attorneys for Plaintiff*
*City of Greensboro, North Carolina*
*(Additional Counsel on the Signature Page)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF GREENSBORO, NORTH CAROLINA, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN SECURITIES LLC, MATTHEW LEBARON, and SCOTT WOLFF, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff City of Greensboro, North Carolina, individually and on behalf of a class of all those similarly situated (the "Class"), complains against Defendants, and alleges on information and belief as follows:

- 1 -

## I.    NATURE OF THE ACTION

1.     This is an antitrust class action arising from a conspiracy, as identified below, to allocate territories and/or not to compete for each other's historical business by rigging bids for, allocating customers and fixing, stabilizing, and maintaining the price of liquid aluminum sulfate (hereinafter "Alum") sold in the United States.

2.     Alum is a coagulant used to remove impurities and other substances from water. It hydrolyzes to form insoluble precipitates, which aid in the removal of tiny particles that cannot be easily filtered or are too small to settle. Essentially, it aggregates small particles of impurities into larger particles that fall to the bottom of a vessel for removal or are filtered out of the water.

3.     This lawsuit is brought as a class action on behalf of all entities and persons that purchased Alum directly from one or more of the co-conspirators from January 1, 1997 through at least February 2011 ("Class Period"). Plaintiffs and the Class include public entities and private water companies, which use Alum in their water and wastewater treatment processes, and paper and pulp manufacturers, which use Alum to remove impurities from the water used to make paper.

4.     Many of the conspirators have already been named as defendants in the Direct Purchaser Plaintiffs' Consolidated Amended Complaint in *In re: Liquid Aluminum Sulfate Antitrust Litigation*, Civil Action No. 2:16-md-02687 (D.N.J.), or in Direct Purchaser Plaintiffs' Complaint against Kemira Chemicals, Inc. and Kenneth A. Ghazey, filed on or about August 9, 2017, as Case No. 2:17-cv-05974 (D.N.J.). The Consolidated Amended Complaint and the Kemira Complaint are hereinafter collectively referred to as the Direct Purchaser Plaintiffs' Complaints.

5.     During the Class Period, American Securities, Matthew LeBaron, and Scott Wolff (collectively, "Defendants"), and their co-conspirators named in the Direct Purchaser Plaintiff Complaints (collectively, "Conspirators"), implemented their Alum conspiracy through several mechanisms. Among other things, the Conspirators agreed that their respective Alum businesses

would "stay away" from each other's "historical" customers and territories. The documentary evidence (which includes specific and detailed communications between and among the Conspirators' executives and employees, including LeBaron and Wolff) shows that the Conspirators operated on the shared understanding that it would be, in their own words, "***better business for everyone to work together instead of competing and ruining the market price***." Conspirators widely discussed this scheme as one intended to maintain "peace in the valley."

6.      The Conspirators regularly met and spoke throughout the Class Period, creating an industry culture where there was no inhibition about discussing customer allocation and prices for Alum. Phone records and emails between top executives at the Conspirator companies demonstrate that they furthered the conspiracy by (a) meeting or otherwise communicating to discuss their respective Alum businesses, including the prices quoted or bid to their customers, (b) agreeing to submit intentionally high "throw-away" bids to a particular customer to ensure that their "competitor," the existing seller to that customer, would continue to "win" that customer's business (or to help that "competitor" raise the prices paid by that customer), and (c) in instances where they inadvertently submitted a winning bid or price quote against a nominal "competitor," withdrawing the inadvertently winning bid or price quote, returning the customer to the original supplier the following year, or allowing that "competitor" to win business from another customer.

7.      As a result of these efforts, the Conspirators were able to raise or maintain the price of Alum at supra-competitive levels. Data on bids produced to Plaintiffs in discovery confirms that bidding throughout the Class Period was infected by the Conspirators' collusion.

8.      The DOJ is likewise investigating the Conspirators' agreement to "fix prices, rig bids, and allocate customers involving contracts for liquid aluminum sulfate"

    a.      On June 21, 2016, Conspirator GEO pled guilty to conspiring to rig bids and allocate customers for, and to fix the price of, Alum supplied to

municipalities and pulp and paper manufacturers in the United States. As a condition of its guilty plea, GEO agreed to pay a fine of $5,000,000. Pursuant to 15 U.S.C. § 16(a), GEO's guilty plea is prima facie evidence of its liability in this civil action.

b.  Conspirator Chemtrade, the current parent of GenChem, publicly disclosed that it "is cooperating with the investigation and has the benefit of the conditional amnesty and a leniency 'marker' from the U.S. Department of Justice." Critically, the DOJ only affords such amnesty where the leniency applicant admits there is evidence suggesting that a criminal violation of the antitrust laws occurred.

c.  On October 27, 2015, Conspirator Frank A. Reichl, a former executive of GenChem, pled guilty for his role in the conspiracy. Conspirator Reichl admitted that he "did knowingly and intentionally conspire and agree with others not to compete for each other's historical business by rigging bids, allocating customers and fixing the price for liquid aluminum sulfate." Conspirator Reichl also admitted that he and others he supervised and co-conspirators did submit "intentionally losing bids . . . in order for the intended winner to be awarded the contract," and that "that agreement came about as a result of meetings and conversations . . . that [he] had with [his] co-conspirators in which [he] discussed each other's liquid aluminum sulfate business."

d.  In addition, Conspirator Vincent J. Opalewski (a former GenChem executive) and Brian C. Steppig (a former GEO executive) have been indicted.

## II.  PARTIES

### A.  Plaintiff

9.  Plaintiff City of Greensboro, North Carolina ("Greensboro") is a municipal corporation chartered by the State of North Carolina. Its principal place of business is located at 300 West Washington Street, Greensboro, North Carolina.

10.  Plaintiff directly purchased Alum from one or more of the Conspirators during the Class Period. As a direct and proximate result of the unlawful conduct and price-fixing conspiracy of the Conspirators alleged herein, Plaintiff and the members of the Class paid more for Alum during the Class Period than they would have paid in a competitive market and have therefore been

injured in their business and property. Plaintiff seeks damages for the inflated Alum prices paid as a result of the Conspirators' illegal conduct.

### B.    Defendants

#### 1.    American Securities

11.    American Securities LLC is a private equity firm based in New York, New York. It is a limited liability company existing under the laws of New York, with its principal place of business at 299 Park Avenue, 34th Floor, New York, New York.

12.    Between in or about 2009 and in or about 2014, American Securities owned the GenChem entities (defined below) through a holding company called GenTek, Inc.

13.    American Securities transacts and transacted business in this District and elsewhere, by and through GenChem, with the other Conspirators.

14.    American Securities participated in the conspiracy alleged herein throughout the period it owned the GenChem entities.

#### 2.    Matthew LeBaron

15.    Beginning in or about 2009 and continuing through 2014, Matthew LeBaron was a Managing Director of American Securities, having joined the firm in 1999.

#### 3.    Scott Wolff

16.    Beginning in or about 2009 and continuing through present, Scott Wolff has been a Managing Director of American Securities, having joined the firm in 2002.

C.    **The Co-Conspirator Corporations**

1.    **General Chemical**

17.    During the Class Period, General Chemical Corporation, General Chemical LLC, and General Chemical Performance Products LLC (collectively, GenChem) manufactured and sold Alum and other water treatment chemicals for use by water and sewage treatment plants and pulp and paper plants.

18.    General Chemical LLC was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 Halsey Street, Parsippany, New Jersey.

19.    General Chemical Corporation was a Delaware corporation with its principal place of business at 90 Halsey Street Parsippany, New Jersey.

20.    General Chemical Performance Products, LLC was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 Halsey Street Parsippany, New Jersey.

21.    Until January 2014, the GenChem entities were part of a holding company known as GenTek, Inc.

22.    GenChem participated in the conspiracy alleged herein throughout the Class Period through the actions of GenChem's senior executives.

23.    In approximately January 2014, Chemtrade Chemicals Corporation, Chemtrade Chemicals US LLC, and Chemtrade Solutions, LLC (collectively, "Chemtrade") absorbed GenChem, and assumed all rights and obligations of GenChem in a transaction valued at approximately $860 million. As the legal successor in interest to GenChem, Chemtrade assumed the liability for damages caused by GenChem's participation in the conspiracy to fix prices and rig bids for Alum.

24.    Chemtrade publicly disclosed that it "is cooperating with the [DOJ] investigation and has the benefit of the conditional amnesty and a leniency 'marker' from the U.S. Department of Justice." Prior to its acquisition by Chemtrade, GenChem had received conditional amnesty from the Department of Justice in connection with this investigation. The DOJ grants conditional amnesty only where the leniency applicant admits there is evidence suggesting that a criminal violation of the antitrust laws occurred.

25.    Chemtrade Chemicals Corporation is a Delaware corporation, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey, and is a wholly owned and controlled subsidiary of Chemtrade Holding Partnership.  It is a successor-in-interest to GenChem.

26.    Chemtrade Chemicals US LLC is a limited liability company organized under Delaware law, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey. It is a wholly owned and controlled subsidiary of Chemtrade Chemicals Corporation and a successor-in-interest to GenChem.

27.    Chemtrade Solutions, LLC is a limited liability company organized under Delaware law, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey. It is a wholly owned and controlled subsidiary of Chemtrade Chemicals Corporation and a successor-in-interest to GenChem.

## 2.    GEO

28.    Geo Specialty Chemicals Inc. ("GEO") is a private corporation with its principal place of business at 340 Mathers Road, Ambler, Pennsylvania. GEO was founded in 1993, and manufactures and sells water treatment chemicals, including Alum. On June 21, 2016, GEO pled guilty for its role in the conspiracy and agreed to pay a $5 million fine.

29.    GEO participated in the conspiracy alleged herein throughout the Class Period through the actions of GEO's senior executives.

### 3.    Southern Ionics

30.    Southern Ionics, Inc. ("Southern Ionics") is a Mississippi corporation with its principal place of business located at 1250 Neosho Ave., Baton Rouge, Louisiana. Southern Ionics manufactures and sells water treatment chemicals, including Alum.

### 4.    C&S

31.    C&S Chemicals, Inc. ("C&S") is a Pennsylvania corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia. C&S manufactures and sells water treatment chemicals, including Alum.

### 5.    USALCO

32.    USALCO, LLC ("USALCO") is a Maryland limited liability company with its principal place of business at 2601 Cannery Avenue, Baltimore Maryland. USALCO is also the successor-in-interest to Delta Chemical Corporation ("Delta") as the result of the purchase of Delta's assets on or about November 17, 2013. USALCO manufactures and sells, and Delta formerly manufactured and sold, water treatment chemicals, including Alum.

### 6.    Kemira Chemicals, Inc.

33.    Kemira Chemicals, Inc. ("Kemira Chemicals") is a Georgia corporation with its principal place of business at 1000 Parkwood Circle, Suite 500, Atlanta, Georgia. Kemira Chemicals is a subsidiary of Kemira Oyj, a publicly traded Finnish company with its principal place of business in Helsinki, Finland. Kemira Chemicals is the successor company to Kemiron Companies, Inc. ("Kemiron"). [1] Kemira Chemicals maintained a 60% ownership interest in Kemiron prior to May 2005, but Kemira Chemicals purchased the remaining 40% interest in May

---

[1] Kemiron Chemicals, Inc. began business in 1992, and was founded by Lawrence Hjersted. Kemiron Chemicals was headquartered in Bartow, Florida and was one of the largest manufacturers of aluminum-based chemicals in North America. Hjersted sold his remaining ownership interest in Kemiron Chemicals, Inc. to Kemira Chemicals in May 2005.

2005. Kemira Chemicals and Kemiron are collectively referred to herein as "Kemira." During the Class Period, Kemira sold Alum throughout the United States directly or through its subsidiaries and affiliates.

### D.    Co-Conspirator Individuals

#### 1.    Frank A. Reichl

34.    Frank A. Reichl resides in Flanders, New Jersey. From 1993 through 2010, Reichl held high-level executive positions at GenChem, including serving as General Manager of Water Treatment from 1993 to 2005 and Vice President of Sales and Marketing from 2006 until he was terminated in 2010. In these positions, Reichl oversaw the sale and marketing of water treatment chemicals, including Alum, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising other sales and marketing employees of GenChem. During the Class Period, Reichl conspired with co-conspirators in their unlawful price-fixing and bid-rigging conspiracy. On October 27, 2015, Reichl pled guilty for his role in the conspiracy.

#### 2.    Vincent J. Opalewski

35.    Vincent J. Opalewski resides in Rockaway, New Jersey. From 2000 through 2011, Opalewski held high-level executive positions at GenChem, including serving as General Manager of the Sulfur Products business group from 1999 to 2005, Vice President of Sales and Marketing from 2005 to 2006, Vice President and General Manager from 2006 to 2009, and President from 2009 to 2011. In these positions, Opalewski's responsibilities included directing the sale and marketing of Alum. During the Class Period, Opalewski conspired with co-conspirators in their unlawful price-fixing and bid-rigging conspiracy. On February 17, 2016, Opalewski was indicted by the United States for his role in this price-fixing and bid-rigging conspiracy.

#### 3.    Alex Avraamides

36.     Alex Avraamides resides in Maywood, New Jersey. From 1994 through 2011, Avraamides held high-level executive positions at GenChem and Conspirator GEO, including serving as the Director of Sales and Marketing at GenChem from 1994 to 2005, the Senior Vice President and General Manager of GEO from 2005 to 2010, and Vice President of Sales and Marketing at GenChem from 2010 to 2011. In these positions, Avraamides's responsibilities included directing the sale and marketing of Alum. During the Class Period, Avraamides conspired with co-conspirators in their unlawful price-fixing and bid-rigging conspiracy.

### 4.     Brian C. Steppig

37.     Brian C. Steppig resides in the Little Rock, Arkansas area. From 1998 through at least 2011, Steppig held high-level executive positions at GEO, including serving as National Sales Manager from 1997 through August 2006 and as Director of Sales and Marketing from August 2006 through at least 2011. In these positions, Steppig's responsibilities included directing the sale and marketing of Alum. During the Class Period, Steppig conspired with co-conspirators in their unlawful price-fixing and bid-rigging conspiracy. On February 17, 2016, Steppig was indicted by the United States for his role in this price-fixing and bid-rigging conspiracy.

### 5.     Amita Gupta

38.     Amita Gupta is a resident of the United States. From April 2008 until September 2012, she was the Director of Sales and Marking for Water Treatment Chemicals for GenChem. In this position, Gupta's responsibilities included directing the sale and marketing of Alum. During the Class Period, Gupta conspired with co-conspirators in this unlawful price-fixing and bid-rigging conspiracy.

### 6.     Kenneth A. Ghazey

39.     Kenneth A. Ghazey ("Ghazey") resides in the Commonwealth of Massachusetts. Beginning in early 2005, soon after GEO was discharged from its Chapter 11 bankruptcy, and

continuing until the present, Ghazey has held the position of President and Chief Executive Officer of GEO. He has also served as a member of GEO's Board of Directors since 2005. During the Class Period, and in his capacity as an officer and director of GEO, Ghazey was an active participant in the anticompetitive scheme alleged herein and, by his acts, omissions, and/or negligence furthered the unlawful price-fixing, bid-rigging, and market allocation conspiracy with Defendants and co-conspirators. Ghazey was directly involved in the coordination and implementation of price fixing, bid-rigging, market allocation and other anticompetitive activity on behalf of GEO, providing direction, instruction, and management support to his subordinates at GEO in furtherance of the unlawful scheme alleged herein.

40.    The Conspirators' acts, as alleged herein, were authorized, ordered, and condoned by their respective parent companies and authorized, ordered, and performed by their officers, directors, agents, employees, representatives or subsidiaries while engaged in the management, direction, control or transaction of their business affairs.

### C.    Additional Co-Conspirators

41.    Various persons or entities not named as a Conspirator herein or in the Direct Purchaser Plaintiff Consolidated Amended Complaint have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. Each of the defendants is jointly and severally liable for the acts of its co-conspirators whether they are named or not named as a Conspirator in this Complaint or in the Direct Purchaser Plaintiffs' Complaints.

### III.    JURISDICTION AND VENUE

42.    This Court has jurisdiction over the subject matter of this action because it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331 & 1337(a).

43.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, the Defendants resided in, transacted substantial business in, were found in, and/or had agents within this District. Venue is also proper in this district because much of the conduct giving rise to Plaintiff's claims occurred in New Jersey.

44.     This Court has personal jurisdiction over the Defendants under 15 U.S.C. §22 and because, *inter alia*, they  (a) transacted business throughout the U.S. and elsewhere, including in this District; (b) participated in the manufacturing and distribution of Alum throughout the U.S. and elsewhere, including in this District; (c) had substantial contacts with the U.S. and elsewhere, including in this District; and/or (d) were engaged in an illegal scheme and competition-elimination conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the U.S. and elsewhere, including in this District.

## IV.    CLASS ACTION ALLEGATIONS

45.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiff brings this action on behalf of the following Class:

> All persons and entities in the United States who purchased liquid aluminum sulfate directly from any one or more of the Conspirators, from 1997 through at least February 2011. Excluded from the Class are Defendants, their co-conspirators, and their respective officers, directors, management, employees, parents, subsidiaries, or affiliates, and all federal governmental entities.

46.     Members of the Class are so numerous that joinder is impracticable. Plaintiff believes there are hundreds, if not thousands of Class members. Further, the Class is readily identifiable from information and records maintained by the Conspirators.

47.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of the Conspirators.

48.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

49.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members. Questions of law and fact common to the Class include:

a)     whether Defendants and their co-conspirators conspired to fix prices, rig bids, and allocate customers of Alum sold in the U.S. and elsewhere;

b)     the duration and extent of the alleged conspiracy;

c)     the identity of the conspirators;

d)     the effect of the conspiracy on the prices of Alum sold in the U.S. during the Class Period;

e)     whether Defendants and their co-conspirators engaged in fraudulent concealment;

f)     whether the alleged conspiracy violated the Sherman Act, § 1; and

g)     the nature and extent of damages to which Plaintiff and the Class are entitled.

50.     Class action treatment is superior to any alternative method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including

providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any hypothetical difficulties in management of this class action.

51.    Class action treatment also is superior to any alternative method to compensate the victims of the conspiracy—Plaintiff and the proposed Class—for the injuries they have suffered as a direct result of the Conspirators' conduct.

52.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.    FACTUAL ALLEGATIONS

### A.    Background Regarding the Alum Industry

53.    Alum is a water treatment chemical that removes impurities and other substances from water. Alum is the salt of sulfuric acid and aluminum hydroxide known by its chemical name $Al_2(SO_4)_3$.

54.    Alum is used in the early stages of the water filtration process and functions as a coagulant. Coagulants are positively charged molecules which attract suspended particles in water and facilitate their removal through sedimentation or filtration.

55.    Alum is one of the most established chemicals utilized in water and wastewater treatment today. Stringent water purity regulations have driven utilization of Alum.

56.    Municipalities and private water companies routinely purchase Alum to treat potable water and wastewater. Municipalities typically acquire Alum through a publicly advertised bidding process, and municipal contracts for Alum are typically one year in duration with options to renew for a certain period of time.

57.    Alum is also used in paper mills for drainage enhancement and to set rosins (a sizing agent used in the manufacturing process). The amount of Alum used in paper manufacturing is

related to the pH level of the production processes—with higher pH levels requiring higher quantities of Alum. For instance, Alum is heavily used in the production of fine paper, which involve pH neutral or alkaline production processes. Alum is used less heavily in the production of newsprint and containerboard, which have more acidic production processes.

58. Pulp and paper manufacturers typically acquire Alum by issuing requests for price to manufacturers, including the Conspirators, and then purchasing Alum pursuant to supply contracts.

59. During the Class Period, approximately 43% of Alum was consumed by pulp and paper manufacturers while approximately 41% was consumed by municipal water and wastewater authorities.

## B. Structural Characteristics of the Alum Market in the United States and Elsewhere Make It Susceptible to Collusion

60. Publicly available data on the Alum industry demonstrates that it is susceptible to cartelization by the Conspirators. Factors that made the Alum market susceptible to collusion during the Class Period include: (1) industry concentration and consolidation; (2) a standardized product for which competition was principally on the basis of price; (3) the lack of available economic substitutes; and (4) stable demand.

### 1. The Alum Industry is Highly Concentrated and Has Experienced Heavy Consolidation

61. When the market for a product is concentrated and dominated by a small number of firms, economic theory holds that it is easier to form and maintain an effective cartel. The Alum industry is highly concentrated, dominated by a small number of producers.

62. The Alum industry experienced significant consolidation in the period leading up to and including 1997. In February 1993, GEO acquired the aluminum chemicals division from

Rhone Poulenc. In July 1994, GEO acquired the aluminum chemicals business of Courtney Industries. In December 1996, GEO acquired the aluminum chemicals division of Cytec Industries.

63.     The consolidation of the industry continued throughout the Class Period. In June 1997, for example, GenChem purchased Augusta Georgia-based Peridot, a producer of sulfuric acid, Alum, and oleum. In September 2006, GenChem acquired GAC MidAmerica, Inc., a producer of Alum and bleach. In February 2007, GenChem acquired Chalum, Inc., which produced Alum for the greater Phoenix area. In December 2007, GenChem acquired Bay Chemical and Supply Company, a producer and distributor of Alum and other water treatment chemicals in south Texas. In early 2011, GenChem acquired certain Alum-related assets of Alchem, including Alchem's customer list.

64.     The concentration of the Alum industry is also enhanced by agreements among the Conspirators to distribute one another's products. Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market such as Alum in the United States and elsewhere also facilitates the formation of collusion among ostensible competitors.

## 2.     Alum is a Commodity Product with a High Degree of Interchangeability

65.     Typically, when a product is characterized as a commodity, market participants compete principally on the basis of price rather than other attributes such as product quality. When competition occurs principally on the basis of price it is easier to implement and monitor a cartel because price is more often objectively measurable and observable than non-price factors.

66.     Further, the bidding process by which suppliers compete to provide Alum to a municipality demonstrates that Alum is interchangeable across suppliers and that competition is primarily based on price.

### 3.    Lack of Substitutes for Alum

67.    The lack of available substitutes for a product facilitates collusion among producers because customers are not able to avoid supra-competitive prices for Alum by switching to another type of inorganic coagulant.

68.    In the water treatment market, switching from Alum to another inorganic coagulant may require the reconfiguration of water treatment plants, which requires a significant expenditure of time and capital. In the paper manufacturing market, there is no viable substitute for Alum.

### 4.    The Alum Market Experienced Stable Demand During the Class Period

69.    Static demand makes the formation of a collusive arrangement more likely. In a competitive market, when faced with stable demand conditions, firms often will attempt to increase sales decreasing prices in order to take market share from competitors. For this reason, firms faced with static demand have a greater incentive to collude to avoid market share or price competition with competitors.

70.    During the Class Period, the Alum market was mature and stable. Demand for Alum grew at approximately 1% to 3% percent per year. In the water treatment industry, demand for Alum is tied to population growth.

71.    The lack of significant demand growth was further exacerbated by the presence of excess capacity. None of the Conspirators' water treatment chemical plants were working at or near capacity for production of Alum during the Class Period. Thus, there was no capacity-related reason for any Conspirator not to compete for Alum business during the Class Period. Absent an antitrust conspiracy, the presence of excess capacity, particularly for a commodity product, means that firms are incentivized to increase their sales by maintaining or even lowering prices, not increasing them.

C.    **The Conspirators' Market Allocation and Related Bid-Rigging Activities**

72.    Prior to the conspiracy, the market for the sale of Alum in the United States and elsewhere was marked by competition. In the mid-1990s, for example, there was a "price war" between GenChem and GEO in which each company bid aggressively for the accounts of the other company.

73.    As reflected in the GEO guilty plea and criminal indictments discussed in greater detail below, this era of competition and price wars ended in 1997 when the Conspirators agreed to "stay away" from each other's "historical" customers by not pursuing the business of those customers, and to engage in related bid-rigging. It appears that the conspiracy was hatched at that time when GEO's Avraamides, GenChem's Reichl, and GenChem's CEO Denny Grandle met and came to an agreement that they would no longer fight for each other's customers. Thereafter, others joined the conspiracy and abided by that agreement. For example, as reflected by communications between executives at GEO and Southern Ionics during the Class Period, the purpose of the Conspirators' conspiracy was to keep "peace in the valley" in order to "not bring down market price" because the Conspirators agreed that it would be "better business for everyone to work together instead of competing and ruining the market price."

74.    Numerous other documents confirm the Conspirators' understanding of their overarching agreement. For example, based on the information currently available to Plaintiff:

a.    A March 31, 2003 GenChem internal marketing strategy memorandum outlined GenChem's strategy for its nominal competitor, USALCO: "Continue to work in conjunction at Akron, OH and Western Michigan accounts."

b.    A March 2006 GEO internal business review concluded that both GenChem and Southern Ionics were "[r]emaining non-aggressive, consistently favoring price increases over share gain strategy."

c.    In September 2008, Housel of GenChem arranged for a meeting with himself and Gupta from GenChem and Steppig and Scot Lang of GEO, a

"get to know you meeting" designed to introduce Gupta to senior staff of their friendly "competitor" GEO, and to discuss market and supply agreements.

75.    Throughout the Class Period, the Conspirators took a number of actions in support of this overarching conspiracy to allocate customers among themselves. Those actions included regular communications with each other in private, including discussions of specific bids and accounts.

### 1.    Regular Inter-Conspirator Meetings and Communications

76.    The Conspirators' executives and employees routinely communicated with each other over the telephone, email and during face-to-face meetings. As admitted by the criminal pleas, the Conspirators discussed their overarching market allocation agreement, as well as specific customer accounts that were off-limits to the other companies, and how to handle the bidding process as it related to those accounts.

77.    For example, in April 2008, Gupta, the then-recently hired Director of Marketing for Alum at GenChem, began the role of coordinating and enforcing the agreement between the Conspirators. On May 28, 2008, Gupta exchanged contact information via email with Steppig, the Director of Sales and Marketing at GEO, who is currently under indictment for his role in this conspiracy. Gupta promised to get "back to [him] with the other info we discussed," and later called Steppig on his mobile phone.

78.    In another example, in or about Spring 2010, representatives of American Securities met with USALCO to discuss areas of "mutual interest."

79.    In addition, on January 14, 2010, Opalewski, Vice President and General Manager of Sales and Marketing for GenChem, emailed Milton Sundbeck, President of Southern Ionics, to discuss arrangements for a dinner meeting. Opalewski wrote: "With regard to dinner, happy to

include the entire team or keep it to you and me. If we do get everyone together, would still like to slip away at some point to discuss the larger issue we touched on."

80.    Trade associations also provided opportunities for the Conspirators to meet frequently and exchange information to facilitate collusion. The Conspirators are members of a number of trade associations in the United States, including the American Water Works Association, American Water Technologists, and the Association of Water Technologies. The Conspirators attended meetings and events sponsored by those associations. Their overlapping membership in various trade associations also provided an incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor one another's activities in the Alum market and punish non-compliance. The Conspirators' participation in trade associations helped facilitate their collusion.

81.    For example, on July 16, 2009, GenChem's Housel contacted Gupta and Reichl regarding a conversation that he had had with Southern Ionics' founder Sundbeck. Housel stated: "Just spoke to Milton [Sundbeck]. He will be attending the SWFC [Southwestern Fertilizer Conference] in San Antonio. He's going to send me his schedule next week . . . they have a suite. Amita - anything you would like me to discuss with him?"

### 2.    Specific Instances of Bid Coordination

82.    Based on the information currently available to Plaintiff, the following are specific instances where the Conspirators coordinated their bids for Alum contracts. While illustrative of how the Conspirators implemented their scheme, they are not an exclusive list of the Conspirators' activities in furtherance of their conspiracy.

### a.    Potlatch-McGehee, Arkansas (2005)

83.    In 2005, GenChem and GEO furthered the conspiracy by coordinating bids for the paper mill of Potlatch-McGehee, Arkansas.

84.     In December 2005, GEO's Avraamides asked GenChem's Rich Fedison what price GEO should bid for the Potlatch-McGehee account. Following that conversation, Avraamides instructed his colleague Steppig to bid $198.73 so that GEO would not take the account from GenChem.

### b.      Columbiana, Alabama (2006)

85.     In 2006, GenChem and GEO furthered the conspiracy by coordinating bids for the municipality of Columbiana, Alabama.

86.     In January 2006, GEO's Avraamides spoke with an employee of GenChem. Avraamides instructed GenChem to bid above $260 per ton for Columbiana's Alum business, so that GEO would win the business.

### c.      Mahrt Paper Mill and Fayetteville, North Carolina (2006)

87.     In 2006, GenChem and GEO furthered the conspiracy by using coordinated bids to swap their historical accounts at MeadWestvaco paper mill in Mahrt, Alabama and the municipality of Fayetteville, North Carolina.

88.     GenChem had been the historical supplier of Alum to the Mahrt paper mill until 2006, when the owners of the mill sought a new supplier. Opalewski or Reichl at GenChem told GEO's Avraamides about the situation. An April 11, 2006 email from Fedison of GEO to Avraamides identified Fayetteville as a location where GenChem would be more freight logical than GEO and could "take a dent out of our swap imbalance."

89.     In an email exchange dated May 22, 2006 between Steppig and Avraamides, they agreed that they needed to work out "The Swap" with GenChem "before we take Mahrt."   Absent this coordination, GEO would not have bid aggressively for what was a historical GenChem account.

90.     In exchange for this and after GEO won the Mahrt paper mill account, a GenChem employee called GEO and asked for the Fayetteville, North Carolina Alum account.  GenChem subsequently won the Fayetteville contract, which had historically been a GEO account. For the September 2005 through September 2006 contract year, GEO, bidding through distributor Southern States, had been the winning bidder for Fayetteville's Alum business. For the September 2006 through September 2007 contract year, GenChem's bid was over $50 per ton lower than GEO's bid, $191.90 per ton for GenChem vs. $248.55 for GEO.

### d.    DeKalb County, Georgia (2009)

91.     In 2009, GenChem and C&S furthered the conspiracy by coordinating bids for DeKalb County, Georgia.

92.     In February 2009, GenChem's Larry McShane expressed interest in the DeKalb County account, which had previously been awarded to RGM of Georgia. After learning that RGM of Georgia was a distributor selling for C&S, McShane emailed Gupta: "so I assume we don't want to take it." Gupta responded "Don't take. Thx."

### e.    Charlotte and High Point, North Carolina (2009)

93.     In 2009, GenChem and Alchem[2] furthered the conspiracy by coordinating bids for the municipalities of Charlotte and High Point in North Carolina. High Point and Charlotte are approximately 80 miles apart on Interstate 85.

94.     High Point was historically Alchem's account, but GenChem placed a low, winning bid in 2009. Alchem's Robert Wolcott called GenChem's Gupta to complain, and they later agreed that Alchem would not bid competitively for the Charlotte account if GenChem withdrew its High Point bid. Gupta did withdraw the bid. She provided Mark Paul of GenChem with contact

---

[2] Alchem is a former manufacturer of Alum that is not presently named as a Defendant.

information for the buyer at High Point and noted that there was a typo in their bid, that they meant to bid $324 per ton rather than $224 per ton.

95.    In June 2009, consistent with the agreement, GenChem submitted a high bid for the Charlotte account. Alchem did not uphold its end of the bargain, underbidding GenChem by $5 per ton to win the account. After GenChem's Gupta called Alchem's Wolcott to complain, Alchem withdrew its winning bid and GenChem was awarded the Charlotte contract.

96.    In 2010, GEO wanted to take the High Point account. In late 2010, GenChem acquired Alchem's list of Alum customers, effective January 31, 2011. GenChem's Avraamides advised GEO and C&S of this development and explained that it would treat the former Alchem customers, including High Point, as GenChem's own "historic" customers. On the next High Point bid, GEO bid high and C&S did not bid at all, despite previously expressing interest in the contract. Alchem had been supplying High Point at $255 per ton. GEO bid at $400 per ton, and GenChem won the account at more than $300 per ton.

### f.    Maryville, Tennessee (2009 – 2010)

97.    In 2009 and 2010, GenChem and GEO furthered the conspiracy by coordinating bids for the municipality of Maryville, Tennessee.

98.    Maryville had historically been supplied by Dycho, a distributor supplied by GEO. In 2009, GenChem submitted a low bid for Maryville, and GEO's Steppig called GenChem's Gupta to complain. Following the conversation, GenChem withdrew its original bid and/or resubmitted a losing bid at a higher price.

99.    In 2010, consistent with Steppig and Gupta's conversation the previous year, GenChem submitted a high bid for the Maryville account, which GEO won.

### g.    Domtar Paper Company (2010-11)

100.    In 2010, GenChem and GEO furthered the conspiracy by coordinating bids for the Domtar paper company.

101.    In December 2010, GenChem's Gupta and GEO's Steppig discussed upcoming Alum price increases for Domtar across the United States so that the companies' price increases would be in line with each other. Following the conversation with Steppig, GenChem submitted bids to Domtar that were higher than the previous year's and higher than it had intended to before speaking with GEO, and it was awarded Domtar business at a $29 per ton increase.

102.    In early 2011, Domtar's purchasing agent was unhappy with GenChem's pricing and called GEO's Steppig to encourage GEO to be competitive at Domtar's Ashdown, Arkansas mill. Steppig then called GenChem's Gupta to ask how GEO should bid in order to look competitive without taking business from GenChem. GEO bid higher than GenChem, which continued to supply the Ashdown mill.

### h.    Georgia Pacific Paper Company (2011)

103.    In 2011, GenChem and GEO furthered the conspiracy by coordinating bids for the Georgia Pacific paper company.

104.    In January 2011, GenChem's Avraamides and Gupta and GEO's Scott Lang, Opalewski, and Steppig spoke with each other about upcoming Alum price increases for Georgia Pacific across the United States so that the companies' price increases would be in line with each other. After GenChem learned that GEO would increase prices by $35 per ton, GenChem raised its increase to $32 per ton, instead of the $23 per ton increase originally planned before coordinating with GEO.

### i.    Sidney, Ohio (2010)

105.    In 2010, GenChem and USALCO furthered the conspiracy by coordinating bids for the municipality of Sidney, Ohio. As of the end of 2010, Sidney, Ohio was a USALCO customer. When the bid for this customer was coming up in December 2010, GenChem's Lisa Brownlee emailed Gupta asking her if "you want to take this one too?" and noting that "US Alco supplies at $418.42. GCC bid $494.00. No history of Delta or Thatcher bidding here. Volume is only 65 tons. To take, I would bid $374 ($308 net for US Alco). To stay away, up $32.00." Gupta responded: "No.  up 32," confirming GenChem decided to "stay away" from USALCO's historic customer.

### 3.    Widespread Anomalous Bidding Behavior

106.    The Conspirators enjoyed supra-competitive profit margins during the Class Period, not counting freight charges. Thus, sellers of Alum had the ability to submit bids at considerably lower prices than they did and still make a profit. Indeed, among the reasons for the Conspirators to agree to allocate customers was to protect their supra-competitive profit margins.

107.    A significant part of the price for Alum is the cost of shipping. It is standard practice in the industry for suppliers of Alum to include in the quoted price the cost of shipping. Because shipping costs are a significant part of the price of Alum, a supplier that is "freight logical," *i.e.*, the supplier that is closest to the customer, has a built-in economic advantage over other suppliers which are materially farther away from the customer, since the freight logical supplier's shipping costs should be less than those of its competitors. The freight logical supplier can offer a lower price at the same profit margin as other suppliers and/or a non-freight logical supplier must cut its profit margin in order to sell at a competitive price.

108.    During the Class Period, based on Plaintiff's analysis for bidding data produced in discovery in *In re Liquid Aluminum Sulfate Antitrust Litigation*, it was common that non-freight-logical suppliers consistently submitted winning bids to the same customer. Throughout the Class

Period, there exists a pattern of bidding among the Conspirators for which there is no reasonable economic explanation other than a conspiracy. There was a common pattern among incumbent Conspirators of consistently winning bids over other Conspirators which submitted what appear to be throw-away bids. In many instances, incumbent non-freight logical Conspirators would continue to win bids over Conspirators with plants materially closer to the customer, but who nonetheless repeatedly submitted bids that were higher than their non-freight logical co-conspirators.

109.    For example, GEO has a water treatment chemical plant in Baltimore, Maryland, but rarely bid for Alum business in the Mid-Atlantic region. Southern Ionics has a water treatment chemical plant in Williamsport, Maryland, which would be freight logical to many locations in southern Pennsylvania, and from which it could also competitively bid in the Mid-Atlantic region, but it did not bid for Alum business in that region.

110.    Additional examples include the following:

a.    Gadsden, Alabama: GenChem (205 miles away) won this bid throughout the period from 2007 through 2011 despite being significantly further away than GEO (90 miles away), C&S (97 miles away) and Southern Ionics (131 miles away), some or all of whom also bid throughout this period.

b.    Mount Clemens, Michigan: USALCO (246 miles away) maintained this customer from 2006 through 2012 despite the fact that a GAC plant (which was acquired by GenChem in 2006) was only 84 miles away.  GenChem consistently bid much higher on this account from 2007-2012 and lost.

c.    El Dorado, Arkansas: GenChem (90 miles away) held this customer from 2004 through 2011 despite the fact that GEO (72 miles away) was closer. GEO's bids were consistently significantly higher than GenChem's.

**4.    Policing and Enforcement Efforts**

111.    The Conspirators also undertook specific efforts to monitor and enforce the conspiracy. If, either intentionally or accidentally, a "competitor" submitted a lower bid to its competitor's historic customer, that would often prompt a complaint that resulted in the withdrawal

of the lower bid. For example, in 2009, GenChem submitted a low bid for the Maryville account held by distributor Dycho, which was supplied by GEO. GEO's Steppig called GenChem's Gupta to complain that she was in breach of the agreement, and GenChem withdrew the bid via telephone call. GenChem then resubmitted a much higher bid so that GEO would win the account.

112.    In addition, where a Conspirator gained business at the apparent expense of its "competitor," that Conspirator would often allow that "competitor" to win business from another customer to keep their respective levels of business and the conspiracy intact. For example, in 2006, GenChem bid for and won an account in Carthage, Texas for 200 tons of Alum, an account which historically belonged to GEO. Following discussions between Avraamides and Housel, GEO and GenChem agreed that GEO would take an account of the same size from GenChem in order to "mak[e] the playing field even again."

### 5.    American Securities' Role

113.    American Securities, through LeBaron and Wolff, was intimately involved with the water chemical business of GenChem, including reviewing and authorizing significant Alum bids and overseeing its announced intent to "optimize" Alum prices within the market, i.e., increase them.

114.    Indeed, shortly after taking ownership of GenChem, American Securities required that all bids over a certain amount receive approval by American Securities. Often the price approved by American Securities was determined by whether GenChem was submitting a bid for one of its incumbent accounts that, in accordance with the conspiracy, Gen Chem was predestined to "win," or whether GenChem would be submitting an intentionally losing "throw-away" bid in furtherance of the conspiracy, such as for an account that was deemed to be "owned" by another conspirator or "owed" as a payback under the conspiracy.

115.    American Securities requested monthly reports that allowed it to monitor the conspiracy. Specifically, these reports allowed American Securities, Lebaron, and Wolff to track whether bids were won by the "incumbent" manufacturer—i.e., the heart of the conspiracy—or whether a challenger had won an Alum bid. These reports also tracked whether other members of the conspiracy submitted intentionally losing bids or "no bids" conforming to the conspiracy, and therefore allowed American Securities to monitor and enforce the anticompetitive conspiracy.

116.    American Securities, through LeBaron and Wolff in particular, engaged in multiple acts to further the anticompetitive conspiracy.

117.    For example, in 2010, Matthew LeBaron, a Managing Director of American Securities, asked GenChem executives to confirm that GenChem would not seek to bid against incumbent competitors for certain large accounts.

118.    LeBaron also personally sought to ensure that bids submitted by GenChem conveyed the correct signals by distinguishing bid amounts for accounts at which GenChem was the historical incumbent and those that were historically supplied by a co-conspirator.

119.    Likewise, in 2010, LeBaron specifically asked Opalewski about recent "signals" in bidding. When Opalewski---now under indictment for his alleged role in the antitrust conspiracy---responded that GenChem would be announcing a price increase through industry publications 25% higher than GenChem's cohorts, LeBaron agreed to the plan to signal price increases to GenChem's competitors.

120.    Similarly, in 2010, Wolff indicated that he and LeBaron had spoken and that they both agreed that GenChem should bid high on two accounts that were then supplied by another manufacturer, instead of competing to try to win the accounts, but that they would re-evaluate if

that manufacturer moved aggressively to try to take an account that GenChem was then supplying, even though the other manufacturer was "freight logical."

121.    American Securities also directly participated in the conspiracy by coordinating efforts to police the conspiracy and bring "competitors" into compliance. For example, in 2009, LeBaron personally requested information about a competitor's largest accounts so that American Securities could determine how best to send a "message" to that competitor because the competitor had recently bid low against an account historically supplied by GenChem.

122.    LeBaron subsequently monitored this GenChem competitor's bidding to see whether the message had been received, as demonstrated by less aggressive bidding by the competitor.

123.    By the summer of 2010, LeBaron was optimistic that Opalewski had taken steps (namely, a subcontracting arrangement) to bring this competitor into compliance. The Department of Justice has noted that cartels frequently use subcontracting arrangements to reward compliance.

124.    American Securities also engaged directly with the Co-Conspirators. For example, in Spring of 2010, representatives of American Securities met with USALCO to discuss areas of "mutual interest."

**D.    The Conspirators' Actions Increased Prices Across The Industry**

125.    During the Class Period, the Conspirators were able to maintain or increase the price of Alum at supra-competitive levels.

126.    Throughout the Class Period, the Conspirators told customers that the price increases for Alum flowed entirely from increases in manufacturing costs, such as the costs of raw materials. For example, in December 2004, Fedison of GenChem told one customer that the industry was facing an "emerging alumina crisis and its impact on raw material costs. In a nutshell, alumina is short globally and producers are accelerating price increases at unprecedented levels."

127.    In reality, however, the Conspirators' supra-competitive prices stemmed from their conduct described herein, including their direct and indirect discussions about prices. In 2010, for example, GenChem acknowledged internally that it was publicly announcing price increases which were above any raw material cost increases.

128.    As a result of the Conspirators' efforts described herein, including their coordination of price increases, the price of Alum increased across the United States during the Class Period. For example, according to the Chemical Market Reporter, the prices of Alum increased approximately 33.8% to 38% between 1998 and 2004. In addition, according to a survey of U.S. drinking water utilities conducted by the Water Environment Research Foundation (WERF), during the period from January 2008 and January 2009, of the U.S. drinking water utilities that responded, those that used Alum experienced an average 53% price increase, with maximum increases as high as 168%.

129.    These price increases contributed to the Conspirators' bottom-lines. For example, between 2007 and 2008, Conspirator GenChem's sales to the water treatment market rose 34% due to, *inter alia*, higher prices for its water treatment chemicals. The following year, price increases on Alum contributed significantly to GenChem's profits as reported in GenTek's 2009 Form 10-K.

**E.    Changes In The Conspirators' Input Costs – Which Were Stable Or Declining For Much Of The Class Period – Cannot Fully Explain The Conspirators' Pricing**

130.    Rising input costs for Alum cannot fully explain the significant price increases the Conspirators charged their customers between 1997 and 2010.

131.    Alum is manufactured by combining sulfuric acid with aluminum trihydrate (also known as alumina or ATH). Aluminum trihydrate is purified from bauxite by dissolving the

bauxite ore in strong caustic soda to form sodium aluminate, which is then precipitated by neutralization to form aluminum trihydrate.

132.    As shown by the graph below, bauxite (the raw material for alumina) prices fell markedly during the period from 1991 to 2003, declining from approximately $43/ton in 1991 to approximately $20/ton in 2003. From 2003 to 2007, bauxite prices rose but did not reach the high prices seen in the early 1990s. In the period that followed, bauxite prices were stable. In 2008, bauxite prices dipped slightly to about $26/ton. Prices in 2009 increased slightly to approximately $28/ton.



133.    Sulfuric acid costs were also relatively stable from 1997 to 2007. A brief spike in sulfuric acid prices in 2008 was followed by a crash in prices by early 2009 and historically low prices for the remainder of 2009 and 2010. However, GenChem maintained higher prices in 2009 despite decreasing commodity prices.

134.    The pricing of the primary input costs of Alum – bauxite and sulfuric acid – cannot fully explain the rise in Alum prices during the Class Period. Instead, the illegal conspiracy to fix the price of Alum resulted in Plaintiff and Class members paying artificially inflated prices.

## VI. THE CONSPIRATORS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

135. The Conspirators fraudulently concealed their conspiracy by making false representations to Plaintiff and members of the Class that they were not engaged in collusion. These false representations took many forms, including "non-collusion affidavits" and representations made in connection with the Conspirators' bid submissions. In addition, the structure of the conspiracy was self-concealing, in that the collusive bids that were submitted through the operation of the conspiracy gave the appearance of competition, when, in fact, none existed. As a result, Plaintiff has neither actual nor constructive knowledge of the facts constituting its claims for relief.

136. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at until at least November 2015, when Reichl's plea agreement was filed and made public. In addition, Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, American Securities', LeBaron's, and Wolff's role in the conspiracy, which was revealed through ACPERA interviews and then confirmed by the documents in the GenChem production.

137. The Conspirators engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for Alum. As discussed above, the Conspirators routinely met and had private conversations where they discussed their plans.

138. The Conspirators fraudulently concealed their misconduct by affirmatively (but falsely) representing to Class members that their Alum bids were free from collusion or illegal coordination. For example, the Conspirators signed "non-collusion affidavits" in connection with

bids made that falsely represented that the bids the Conspirators submitted were genuine and not collusive.

139.    In other instances, rather than submit a non-collusion affidavit, municipalities required the bidders to represent, and the Conspirators did falsely represent, that each bid was not subject to or involved in any understanding or agreement with any other person or company. These false representations were meant to, and did, prevent Plaintiff and members of the Class from discovering the conspiracy.

140.    In announcing price increases for Alum, the Conspirators often asserted that the cause of such increases was attributable entirely to higher raw material and energy costs, even though the increased pricing more than covered any increases in raw material costs and, critically, without disclosing their conspiracy to fix and maintain Alum prices. Further, even when raw material prices dropped, the Conspirators often failed to make corresponding adjustments to their prices.

141.    The Conspirators also fraudulently concealed their conspiracy by ensuring that there were few written communications regarding their conspiracy and agreement. For example, emails among the Conspirators' officers in furtherance of the conspiracy were often sent to and from personal email addresses, asking one another to speak via telephone, and telephone calls among the various conspirators were made from personal mobile phones rather than from office phones. In at least one instance, GEO's Steppig explicitly acknowledged that "the number [GenChem's Gupta] called was [his] mobile number."

142.    The Conspirators' secrecy ensured that Plaintiff could not have had either actual or constructive knowledge of the conspiracy until the public disclosure of the DOJ's criminal investigation.

143.    Because the Conspirators' agreement, understanding, and conspiracy was kept secret, Plaintiff and members of the Class were unaware of the Conspirators' unlawful conduct alleged herein, did not know that they were paying artificially high prices for Alum during the Class Period and could not have discovered the conspiracy and agreement by the exercise of due diligence.

144.    Plaintiff and members of the Class exercised due diligence in many ways, including, *inter alia*, asking the basis for price increases and/or requiring the Conspirators to submit declarations that their bids were not the product of collusion.

<u>**COUNT ONE**</u>
**(Violation Of Section 1 Of The Sherman Act, 15 U.S.C. § 1)**

145.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

146.    Through the conduct alleged in this complaint, Defendants and their co-conspirators violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to increase prices and otherwise restrain competition in the market for Alum sold to Plaintiff and Class members during the Class Period.

147.    Defendants are *per se* liable under Section 1 of the Sherman Act for the injuries and damages caused by their conspiracy in restraint of trade as alleged herein.

148.    Defendants and their co-conspirators furthered and effectuated their conspiracy in the following ways, among others:

a)    Participating in secret communications, discussions, and meetings in the U.S. and elsewhere to exchange confidential and competitively sensitive information regarding each other's Alum business;

b)     Agreeing, during those conversations and meetings, to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c)     Tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d)     Submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

e)     From time to time, discussing and agreeing during those conversations and meetings, to set a price floor to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

f)     Where a co-conspirator could not withdraw its inadvertently winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer;

g)     Instructing new employees how to determine whether and how to bid on, or quote a price for, the business of Alum customers so as to comport with the agreement not to compete between Defendants and co-conspirators; and

h)     Selling Alum to customers at collusive and non-competitive prices in the U.S.

149.    Defendants and their co-conspirators fixed, raised, stabilized and maintained at artificially high and supra-competitive levels the prices for Alum charged to Plaintiff and Class members in the U.S.

150.    Defendants and their co-conspirators caused Plaintiff and Class Members to pay more for Alum than they would have paid in the absence of a price-fixing conspiracy.

151.    As a direct and proximate result of the unlawful combination, contract or conspiracy, Plaintiff and Class members sustained damages to their business and property. The conspiracy had its intended effect, as prices for Alum sold in the United States during the Class Period were higher than they would have been but for the wrongful conduct of Defendants and their co-conspirators as alleged in this complaint.

152.    As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class have been injured in their business and property in that they have paid more for Alum than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

153.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointing Plaintiff as class representative and its counsel of record as class counsel;

B.    Adjudging and decreeing that acts alleged herein are unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.    For the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

D.    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest as provided by law, including that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

E.    Awarding Plaintiff and the members of the Class the costs of this suit, including reasonable attorney fees; and

F.    Awarding such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all issues so triable.

Dated: September 1, 2017            /s/ Robert S. Kitchenoff
                                   Robert S. Kitchenoff
                                   **WEINSTEIN KITCHENOFF & ASHER LLC**
                                   100 South Broad Street, Suite 705
                                   Philadelphia, PA  19110-1061
                                   kitchenoff@wka-law.com
                                   Tel: (215) 545-7200
                                   Email: kitchenoff@wka-law.com

                                   Scott C. Gayle
                                   **TUGGLE DUGGINS P.A**.
                                   P.O. Box 2888
                                   Greensboro, NC  27402-2888
                                   Tel: (336) 271-5232
                                   Email: sgayle@tuggleduggins.com

                                   *Attorneys for Plaintiff*
                                   *  City of Greensboro, North Carolina*

                                   James E. Cecchi
                                   Lindsey H. Taylor
                                   Zachary S. Bower
                                   **CARELLA BYRNE CECCHI OLSTEIN**
                                   **BRODY & AGNELLO, P.C**.
                                   5 Becker Farm Road
                                   Roseland, NJ 07068
                                   Tel: (973) 994-1700
                                   Email: jcecchi@carellabyrne.com
                                          ltaylor@carellabyrne.com
                                          zbower@carellabyrne.com

                                   *Interim Lead Counsel and*
                                   *Chair of the Plaintiffs' Steering Committee*

Bruce D. Greenberg
**LITE DEPALMA GREENBERG, LLC**
570 Broad Street, Suite 1201
Newark, NJ  07102
Tel:  (973) 623-3000
Email:  bgreenberg@litedepalma.com

*Liaison Counsel*

Michael D. Critchley
**CRITCHLEY, KINUM & DENOIA LLC**
75 Livingston Ave.
Roseland, NJ  07068
Tel:  (973) 422-9200
Email: mcritchely@critchleylaw.com

Eric B. Fastiff
David Rudolph
Katherine L. Benson
**LIEFF, CABRASER, HEIMAN &**
 **BERNSTEIN, LLP**
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111
Tel:  (415) 956-1000
Email:  efastiff@lchb.com
          drudolph@lchb.com
          kbenson@hchb.com

Paul J. Geller
**ROBBINS GELLER RUDMAN &**
 **DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel:  (651) 750-3000
Email:  pgeller@rgrdlaw.com

Manuel Juan Dominguez
David A. Young
**COHEN MILSTEIN SELLERS & TOLL**
2925 PGA Boulevard
Palm Beach Gardens, FL  33410
Tel:  (561) 833-6575
Email:  dominguez@cohenmilstein.com
          dyoung@cohenmilstein.com

H. Laddie Montague, Jr.
Ruthanne Gordon
Candice J. Enders
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA  19103
Tel:  (215) 875-3000
Email:  hlmontague@bm.net
          rgordon@bm.net

Sanford P. Dumain
**MILBERG LLP**
One Pennsylvania Plaza
50th Floor
New York, New York  10119
Tel:  (212) 594-5300
Email:  sdumain@milberg.com

cenders@bm.net

Linda P. Nussbaum
**NUSSBAUM LAW GROUP PC**
570 Lexington Avenue, 19th Floor
New York, New York 10022
Tel:  (212) 702-7053
Email:  lnussbaum@nussbaumpc.com

Lisa J. Rodriguez
**SCHNADER HARRISON SEGAL**
  **& LEWIS LLP**
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ  08002
Tel:  (856) 482-5222
Email:  lrodriguez@schnader.com

Christopher A. Seeger
**SEEGER WEISS LLP**
77 Water Street, 26th Floor
New York, New York  10005
Tel:  (212) 584-0700
Email:  cseeger@seegerweiss.com

Whitney Erin Street
**BLOCK & LEVITON LLP**
520 Third Street, Suite 108
Oakland, CA  94109
Tel:  (415) 968-8999
Email:  whitney@blockesq.com

*Members of Plaintiffs' Steering Committee*